HOMER W. NASH v. MARY E. BURCHARD AND MARTIN L. SWEET.

*Equity—Accounting—Principal and surety—Will.*

1. One who has acted as agent for another, and kept his own accounts, knows, if anybody does, how much money he has paid out, and what obligations he has assumed, in behalf of his principal, and what portion he has paid and discharged and what remains unpaid, and the account is not a mutual one; hence equity has no jurisdiction of a suit by the agent for an accounting.

2. A surety, who receives an agreed security for his indorsement of the principal's notes, cannot, until he has paid them, call upon the principal for any additional security, nor can he ask for any different contract for security than that which he originally received.

3. In order to secure a surety, the principal inserted an agreement in her will to pay to him upon her death $5,000, which she declared should be a first lien upon the estate she should leave at her death, and directed her executor to pay said sum to the surety out of *said* estate after paying her funeral expenses. And it is held that the provision in no way interfered with the disposition or use by the testatrix of any or all of the property she possessed when the will was made, and that the lien only attached to the estate remaining at her death.

4. Neither a contract creditor nor a surety can, by proceedings in equity, compel his debtor or principal to turn his property over to a receiver to secure a debt or satisfy it before obtaining judgment and exhausting his remedy at law.

5. It is competent for the first indorser to secure the second

indorser, but the maker has no right to be subrogated to the place of a second indorser.

Appeal from Kent. (Grove, J.) Argued June 10, 1891. Decided July 28, 1891.

Bill for an accounting, and for a receiver. Complainant appeals. Decree dismissing bill affirmed. The facts are stated in the opinion.

*E. S. Eggleston,* for complainant, cited no authorities.

*Uhl & Crane,* for defendants, contended:

1. The complainant can have no relief against the express conditions of his own bond given for the purchase of goods. He does not allege incapacity, or illegality, or fraud or mistake of fact in its execution; citing *Fraser v. Fraser's Estate,* 42 Mich. 275, 281, 282.

2. The bill cannot be sustained as one to reach equitable assets. It does not show that the complainant has exhausted his remedy at law by the return of an execution unsatisfied; citing *Steward v. Stevens,* Har. Ch. 169; *Thayer v. Swift,* Id. 430; *Stafford v. Hulbert,* Id. 435; *Smith v. Thompson,* Walk. Ch. 1; *Maynard v. Hoskins,* 9 Mich. 485; *Tyler v. Peatt,* 30 Id. 63; *Preston v. Wilcox,* 38 Id. 578; *Vanderpool v. Notley,* 71 Id. 422; *Brock v. Rich,* 76 Id. 644; *Pierce v. Rich,* Id. 648.

3. The bill does not allege that Mrs. Burchard ever agreed to bequeath a legacy to complainant, and charge the same upon specific real estate, and therefore he has no lien growing out of a contract to make a provision for him by will. Such a contract would be within the statute of frauds, and revocable during the testator's life-time; citing *DeMoss v. Robinson,* 46 Mich. 62.

4. The bill does not show the death of the testatrix. The will is therefore ambulatory, and may at any time be altered or revoked by the testatrix during her life, and can only be operative at her death; citing 4 Kent, Com. 520.

5. The bill does not show that Mrs. Burchard ever agreed to secure the complainant for any sum whatsoever upon any property whatsoever; the complainant, therefore, does not show any lien arising out of the contract; citing *Kelly v. Kelly,* 54 Mich. 30, 47.

6. The will has not been admitted to probate, and is therefore

ineffectual to pass either real or personal estate; citing How. Stat. § 5804; and until probated a will is without any fixed legal value as a will; citing *Allison v. Smith*, 16 Mich. 405, 429.

7. The complainant is not a legatee; he has only been named such in an instrument purporting to be a last will and testament, but the validity of which has yet to be determined; citing *McFarlande v. Clark*, 39 Mich. 44.

8. The testatrix is living, and therefore has no heirs, and it is beyond the jurisdiction of this Court to compel her to enter upon a contest with complainant, who can have no standing in court until after her death, and none then should the will be revoked; citing *Lloyd v. Chambers*, 56 Mich. 240.

9. The next of kin, heirs at law, and the devisees of Mrs. Burchard are not made parties, and are entitled to be heard, and nothing can be determined in regard to this will until they are made parties; citing same case.

10. If we should concede, for the sake of the argument, that the complainant was surety for Mrs. Burchard, he would not then be entitled to relief. His bill does not show that he has paid the judgment, and therefore as a surety he has no standing in court. A surety, upon the failure of his principal to pay or perform promptly, cannot compel him to turn over his property to a receiver to be applied to the satisfaction of his undertaking. The surety must first pay the obligation, and then sue for an idemnity; citing *McElroy v. Hatheway*, 44 Mich. 401, 402.

CHAMPLIN, C. J. This case comes before us upon demurrer to the complainant's bill.

The complainant is Homer W. Nash, of the city of Detroit, and he files this bill of complaint against the defendants, the principal statements contained therein being as follows:

1. That prior to the year 1882, and up to June 23, 1882, there had existed a firm known and called C. Burchard & Co., which was engaged in the business of making and vending men's clothing in the city of Grand Rapids, which firm was composed of Mary E. Burchard and Frederick Lyon; that the firm of Burchard & Co. sold out the business and stock in trade to the firm of Lyon & Gray, composed of said Frederick Lyon and Louis M. Gray; that the assets of the firm of Burchard

& Co. at the time of the sale were as follows:. Stock of merchandise then on hand, claimed to have been inventoried at the sum of $7,317.46, and good and collectible accounts to the amount of $2,406.71, and cash then on hand, $114.04,—which stock, accounts, and cash on hand were sold by the firm of C. Burchard. & Co. to the firm of Lyon & Gray for the sum of $7,317.46, and a chattel mortgage upon the stock in trade was given by the firm of Lyon & Gray to Mary E. Burchard for that sum.

2. That there was afterwards paid upon the indebtedness to Mary E. Burchard the sum of $1,317.46, leaving a balance due and secured by the chattel mortgage of $6,000; that afterwards, in the month of March, 1884, the firm of Lyon & Gray became involved and unable to pay their debts, and made an assignment to Lyman D. Follett for the benefit of their creditors; that the assignee took possession of the stock, and caused it to be inventoried, with the fixtures in the store, which inventory made about the sum of $5,800; that within a few days thereafter Mary E. Burchard caused the stock of goods to be seized under and by virtue of her chattel mortgage, and caused the same to be sold thereunder at public auction in the city of Grand Rapids, which stock was sold for the sum of $2,600 to the complainant, Homer W. Nash.

3. That the said Lyon & Gray, in order to secure their indebtedness to their creditors, had given their notes and procured the indorsement of the same by the said Mary E. Burchard to the amount of $1,500, a part of which had been paid by the said Lyon & Gray, which left said indebtedness with her indorsement to the amount of about $900.

4. That, at the time of said sale by the firm of C. Burchard & Co. to Lyon & Gray, there were outstanding liabilities of C. Burchard & Co., for which Mary E. Burchard had given her individual notes, indorsed by Homer W. Nash, which were at that time unpaid.

5. That from the time of said sale by C. Burchard & Co. to Lyon & Gray, on or about the 23d of June, 1882, complainant had been acting as the friend, adviser, and assistant of the said Mary E. Burchard in her financial affairs, and at the time of the seizure of the said goods by the said Mary E. Burchard, under and by virtue of the chattel mortgage, it was arranged and agreed, by and between Mary E. Burchard and Homer W. Nash, that he

should attend the sale, and, unless the property should be sold to other bidders for something near its value, that he, Nash, should bid in the same in his own name, but for the said Mary E. Burchard, in satisfaction, so far as it should go, of her said mortgage; that under the said arrangement Nash attended the sale, and bid in the property in his own name, but for the use and benefit of said Mary E. Burchard.

6. That the said Mary E. Burchard, being anxious to obtain employment for her son Frederick, at the same time agreed with Nash that he should take charge of the said stock in trade and business, and continue the same for her benefit, and permit her said son to have charge of the business of manufacturing and selling, and the collecting of moneys, and to account to Nash therefor, and that Nash should make purchases of goods as they might be needed for the purpose of keeping up the stock of goods, and making the same salable, until such time as the money due to the said Mary E. Burchard should be made out of the same; that Nash entered upon said business, took possession of the store and stock in trade and business, and put the said Frederick into the store to manage and care for the manufacture and sale of the goods, and to attend to collections, and continued the same in that way for about two months, when it was found that said Frederick was inefficient and inattentive, and that the business was being neglected and injured; that thereupon Nash, with the consent of Mary E. Burchard, employed George R. Nash to enter into said store, and take charge of the sales, and the money accruing from the sales and collections of the said business, and that thereupon said Frederick abandoned the same; that the business was continued until the latter part of December, 1884, when Nash caused said property to be advertised for sale at public auction, with a view of closing up the said business, it having proved unsatisfactory and unprofitable.

7. That, after he had taken possession of the stock of goods under and by virtue of said sale, one A. Origet, who was a creditor of the firm of Lyon & Gray to the amount of about $3,300, thereupon attached the stock in the hands of Nash, and, to avoid suit, seizure of goods, and stoppage of business, it was agreed between Nash and Mary E. Burchard that a compromise should be made, if possible, with the said Origet, and that Nash succeeded in

settling with him for the sum of about $1,860, for which Frederick Lyon gave his notes, payable to the order of Nash, and which he indorsed, and that it was at the same time· agreed between him and the said Mary E. Burchard that the said notes should be paid out of the proceeds of the said business.

8. That, after he had purchased the stock of goods at the sale under the chattel mortgage, he gave to the said Mary E. Burchard his bond, conditioned for the payment of the purchase price of the said goods, to wit, the sum of $2,600, in four years from the date thereof, which said bond was given in fact as security to the said Mary E. Burchard for the faithful discharge of his duties as agent of the said Mary E. Burchard in the carrying on and transacting of said business, and with the agreement that the moneys realized from the said business should be applied to the satisfaction of the said bond; that at the time of the giving of said bond Nash was not in anyway indebted to Mary E. Burchard, and the bond was not given for any indebtedness of his to her.

· 9. That, immediately after the said George R. Nash entered upon the control of the business, he caused an inventory to be taken of the goods then on hand, and found, upon examination, that they consisted mainly of old goods, remnants, and stock that had been on hand in the store many years before the purchase by Lyon & Gray, and were unsalable, and comparatively worthless; that the stock then on hand, inventoried at the old cost price, amounted to the sum of $5,821.08, while it was, in truth and in fact, not worth in the market to exceed one-third of that sum.

10. That during the time that Homer W. Nash carried on the said business, which was for a period of about 11 months, the goods purchased by him and put into the business, and the cost of manufacturing the same, amounted to the sum of $7,420.23; that during that time the sales made in the regular course of said business amounted to the sum of $7,962.25, and the money realized upon the sale of the balance of said goods at auction amounted to the sum of $1,668.65.

11. That, estimating the said goods at the price at which they were inventoried, the loss upon the business at the time of closing the same out was $3,610.04, which left the sum of $2,210.67 to be accounted for by Nash, and which he accounts for as follows: Expenses of

closing out the stock, consisting of the salary of George R. Nash and store rents and incidental expenses, amounted to the sum of $1,598.20, and the amount paid by Nash on the claim of Origet amounted to the sum of $612.47.

12. That since the closing out of the business he has paid and secured to be paid the amount of the balance of the claim of said Origet, amounting to $1,277.53, and has given his note for $500, indorsed by Mary E. Burchard and Martin L. Sweet, and paid to Mary E. Burchard $29.84, making a total of $1,807.37, which Nash has either paid or become obligated to pay.

13. That, at the time of the sale of C. Burchard & Co. to Lyon & Gray, the firm of C. Burchard & Co. was indebted to various creditors for large sums of money, which were by Nash, as agent of Mary E. Burchard, reduced by various means to the sum of $2,200, for which said Mary E. Burchard gave her notes, which were indorsed by Nash, and are now unpaid, and held by the Fourth National Bank of the city of Grand Rapids; that he has advanced out of his own means, since the closing out of said business, for Mary E. Burchard, the sum of $150, which was paid to Peter Doran for services and expenses incurred by him in attempting to collect of the estate of the father of the said Louis M. Gray a part of the indebtedness of the firm of Lyon & Gray.

14. That he has paid in money and become obligated to pay for her a large sum of money, to wit, the sum of $4,157.37, and that she actually owes him for services rendered in the conduct of said business the sum of $1,800, together with the interest which has accrued upon the said several sums.

15. That at the time of making and entering into the agreement by which Nash purchased the said stock of goods at the said sale under the foreclosure of the chattel mortgage of the said Mary E. Burchard, and the giving of the said bond in the sum of $2,600, the said Mary E. Burchard had no unincumbered property or means with which to secure Nash for his said indorsements and his said undertakings, and, in order to secure him from loss by reason of the same, she at the same time made, executed, and delivered to him her then last will and testament, which said last will and testament contained the following statement, to wit:

. "Feeling under great obligation to my trustworthy friend, Homer W. Nash, of the city of Grand Rapids, for the aid and assistance he has rendered to me in extricating my affairs from financial embarrassment, and saving to me a considerable portion of my property; and he having this day given to me his bond conditioned for the payment to me of the sum of $2,600 four years from the date thereof, with interest thereon at the rate of seven per cent. per annum; and he having undertaken to discharge and relieve me from certain other money obligations which I owe to a large amount; and it being expected that he will be able to realize the money to pay the said bond and other indebtedness out of the goods and property of the late firm of Lyon & Gray, sold by me to him, the said Homer W. Nash, under and by virtue of a chattel mortgage owned and held by me upon the said stock of the said goods, not being in my judgment a certain and sufficient security to him,—now in consideration thereof, and being legally bound to save him harmless from any and all loss by reason of his having purchased the said goods, and given his said bond, and having undertaken other obligations owing by me, and 'being desirous of securing him from any such loss, and having now no other means of doing so, I hereby, in consideration of the premises, agree to pay to the said Homer W. Nash, or to his legal representatives, upon my death, the just and full sum of $5,000; and to that end I hereby declare that sum to be a first lien upon any and all estate I may leave at the time of my death, in favor of the said Homer W. Nash and his legal representatives, and I hereby direct my executor and require him, after having paid the necessary expenses of my burial, to first pay and discharge out of my estate said sum of $5,000 to said Homer W. Nash or his legal representatives."

16. That since the making of the said will said Mary E. Burchard has sold and transferred to the Michigan Masonic Home Association her farm, known as the "Burchard Farm," and the stock thereon, for the sum of $10,000, and has received to herself the sum of $3,300 or thereabouts, being the amount coming to her from the said sale after paying the incumbrances existing upon said property; and that since that time she has also sold five lots upon what is known as the "Comstock Addition," adjoining to the city of Grand Rapids, to one John Youell, as complainant is informed and believes, for the sum of $1,500.

17. That he is informed and believes, and charges the fact to be, that the said Mary E. Burchard has appropriated the proceeds of said sales to her own use, and

intends to use the same, and place it beyond the reach of the provisions made by her in her said will, and to defeat complainant's security for the said sums of money which he has paid as hereinbefore stated, and which he has become obligated to pay.

18. That upon the closing out of the said business he was obliged to borrow money to pay and discharge the losses he had incurred in carrying on said business, and did borrow of Thomas Peck the sum of $500, and gave him his note therefor, which was indorsed by the said Mary E. Burchard and Martin L. Sweet, which said note remained unpaid for a long period of time, and was finally paid and discharged by Nash giving another note to the Grand Rapids Savings Bank, and procuring the same to be discounted, which said note was afterwards, on the 6th day of April, 1887, renewed by a note for the sum of $509.04 made by Nash, payable to the order of said Mary E. Burchard, 90 days after date, at the Grand Rapids Savings Bank, Grand Rapids, Mich., which note was indorsed by the said Mary E. Burchard and the said Martin L. Sweet; and, the said note remaining unpaid, afterwards, and on the 6th day of April, 1887, a judgment was obtained by the Grand Rapids Savings Bank against Nash as principal, and said Mary E. Burchard and Martin L. Sweet as indorsers, in the circuit court for the county of Kent, for the amount of $534.34 damages, and the costs taxed at $23.05, which judgment still remains unsatisfied of record.

19. That he is informed, and believes the same to be true, that sometime in the year 1887, and prior to April 6, 1887, said Mary E. Burchard, in order to secure the said Martin L. Sweet from loss and damage by reason of his having indorsed said note, made, executed, and delivered to him a deed of certain lands then owned by her in the state of Missouri, which are described in the bill of complaint.

20. That the indebtedness, which the money represented by the said note was borrowed to pay, arose and grew out of the said business of said Mary E. Burchard as above set forth, and was not for any indebtedness whatever owing by Nash on his own account, or in any other way or manner than as the agent of said Mary E. Burchard in the conduct of said business.

21. That the said Martin L. Sweet, although secured as aforesaid against loss by reason of having made the

said indorsement, absolutely refused to pay said judgment, and was using every means in his power to force a collection of the same out of the complainant, while he holds in his hands the property of said Mary E. Burchard which he ought justly to apply to the satisfaction of the judgment.

22. That the said Mary E. Burchard has for a long time held and owned a policy of insurance upon the life of her son Frederick for the sum of $5,000, issued to her by the Connecticut Mutual Life Insurance Company of Hartford, Conn., which policy is numbered 148,578; and Nash is informed and believes, and so charges the fact to be, that Mary E. Burchard still holds the said policy of insurance in full force and vigor; and he charges that she ought, in fairness and good faith, to assign and transfer the same to him as security for the advances he has made and obligations he has undertaken, as set forth in this his bill of complaint, but that she unjustly and unfairly refuses to make any such transfer, or to do anything to secure him for his said advances and liabilities, made and undertaken in her behalf, and in the transaction of her said business.

23. Nash in his said bill offers, in case the prayer of his bill for the assignment and transfer of the policy of insurance shall be allowed, to pay and discharge the premiums that may become due from time to time upon said policy, or to secure the same to be paid in such manner as the court shall direct.

The prayer for relief is as follows:

1. That Mary E. Burchard may be required to come to an accounting with him respecting the business and trust conducted and carried on by him in her behalf set forth in the bill, and that the amount due to him from the said Mary E. Burchard may be ascertained and determined, and that she be decreed either to pay him the amount which shall be found due to him upon said accounting, or to secure to him the payment thereof.

2. That a receiver may be appointed of the property and assets of said Mary E. Burchard, with power and authority to take an assignment of said policy of insurance, and with power and authority to pay the premiums upon said policy as the same shall mature, and keep the same alive and in force during the life of the said Frederick Lyon, and upon his death to collect and receive

the money that shall be due thereon, and to invest the same under the order and direction of the court, and annually pay over to the said Mary E. Burchard the net earnings of the said fund so long as she shall live, and after her death to pay over to Nash, or his executors, administrators, and assigns, the remainder of the said fund.

3. That said receiver have power also to take and receive from the said Martin L. Sweet a conveyance of the said 760 acres of land lying and being in the state of Missouri, and to hold the same in trust for the following uses and purposes, to wit: To sell and dispose of the same under the order and direction of the court, and reimburse himself out of the proceeds of such sale for all the lawful taxes that may have been assessed thereon and paid by him, and, next, to pay, satisfy, and discharge any and all indebtedness that may be found to be due from the said Mary E. Burchard to complainant; and that in the mean time said receiver be authorized and directed to pay and discharge all taxes lawfully assessed upon or against said land.

4. That said Mary E. Burchard may be ordered and directed by the decree of the court to assign, set over, and transfer to said receiver all her right, title, and interest of, in, and to the said insurance policy, and that the said Martin L. Sweet be ordered and directed by the decree of the court to set over and transfer to the said receiver, by a good and sufficient deed of conveyance, all of said land lying and being in the state of Missouri, upon payment of the judgment.

5. He also prays for an injunction against Mary E. Burchard, restraining her from selling, assigning, or transferring the policy of insurance, and restraining Martin L. Sweet from incumbering, selling, assigning, or transferring the Missouri lands, and that the Connecticut Mutual Life Insurance Company be restrained from accepting, acknowledging, and approving any assignment, transfer, or incumbrance of the policy of insurance on the life of Frederick Lyon to any person whomsoever, except such as shall be designated by the court. There is also a prayer for such other and further relief as shall be agreeable to equity and good conscience.

It is difficult to imagine the head of equitable jurisdiction under which the complainant's right to relief

depends. Briefly stated, the complainant shows that he became an indorser for the firm of C. Burchard & Co., composed of Mary E. Burchard and Frederick Lyon; that he at that time was the friend, adviser, and assistant of Mary E. Burchard in her financial affairs. He does not allege that she had any other adviser, and it may be presumed that, in all the transactions narrated, she was acting under his advice. Then followed the sale to Lyon & Gray, who did business from June 23, 1882, to March, 1884, when they assigned to Follett. Up to this time the business relations between Nash and Mrs. Burchard were that of debtor and creditor, he being an indorser upon notes which grew out of the business transactions of C. Burchard & Co. It does not appear that up to the date last mentioned he had paid any money upon the notes indorsed by him. As soon as the property passed into the hands of the assignee, an agreement was entered into between Nash and Mrs. Burchard to the effect that the goods should be seized and sold upon her chattel mortgage, he should become the purchaser for her benefit, and the purchase price should be applied, so far as it would go, to the satisfaction of her mortgage; and Nash agreed that he would take charge of the stock in trade and business, and continue the same for her benefit, and permit Frederick Lyon to have charge of the business and account to him; Nash agreeing also to make purchases of goods to keep up the stock until such time as the money due from Nash to her could be made out of the same. He gave her his bond, conditioned for the payment of the purchase price, namely, $2,600, four years from the date thereof.

As a part of this agreement, to secure Nash from loss by reason of his indorsements, she at that time made, executed, and delivered to him her last will and testament, in which she recites that, in consideration of

Nash having given this bond for $2,600, and undertaken to discharge and relieve her from certain other money obligations which she owed to a large amount (and in which she expresses the expectation that he will be able to realize the money to pay the said bond and other indebtedness out of the goods and property sold to him under the chattel mortgage, but which she considers an uncertain and insufficient security to him), and being desirous of securing him from loss, she thereby agrees to pay him $5,000 upon her death, and declares such sum to be a first lien upon any and all estate she shall leave at the time of her death, and directs it to be paid out of her estate as the first payment after the payment of her burial expenses. The only indebtedness which the bill shows to have existed at the time upon which complainant was obligated were the notes held by the Fourth National Bank, as stated in the thirteenth paragraph of his bill, amounting to $2,200. He makes no case under this agreement for equitable relief.

He further shows that, after he had become the purchaser of the stock at the mortgage sale, new complications arose. A creditor of Lyon & Gray attached the goods, and they thought it better to settle than to litigate, and he became the indorser for Lyon for $1,860, and agreed with Mrs. Burchard that the note should be paid out of the proceeds of the business. He shows that he carried on the business for about 11 months, and finally closed it out at auction. He does not allege that this manner of conducting and closing out the business was with the consent of Mrs. Burchard. The bill alleges that in so conducting the business, and in all the transactions, he was acting as the agent of Mrs. Burchard. If he acted as an agent, he kept his own accounts. He knows, if anybody does, how much money he has received,

how much he has paid out, and what obligations he has assumed in her behalf, and what he has paid and discharged, and what remain unpaid. It is not a case of mutual accounts; the account is all upon one side. Hence chancery has no jurisdiction on the score of accounting.

Equity often treats the transactions between principal and agent as of a *quasi* fiduciary character, and, where such fiduciary relation exists, it will lay hold of the duty resting upon the defendant to render an account, and compel him to do so. In such cases, it is usually the agent who occupies the position of *quasi* trustee, and, if this were a bill brought by Mrs. Burchard upon the alleged agency substantially as stated in the bill, equity might, under proper charges of malfeasance against the defendant, compel him to account. But the agent, Nash, has no such right to call upon Mrs. Burchard for an account under the statements of his bill.

In *Padwick v. Stanley*, 9 Hare, 627, the bill was filed by a solicitor and agent against his client, and prayed for an account of moneys and liabilities which the complainant stated he had raised, advanced, and incurred for the defendant by means of bills, notes, and otherwise, and the particulars of which he alleged were very complicated, and for the discovery of letters and documents relating to such transactions, which the bill averred the complainant had from time to time written and given up to the defendant, and of divers of which the complainant stated he had no copies. The bill sought to have the balance of the account paid, and that the complainant might be discharged from such alleged outstanding liabilities. The defendant demurred.

The vice-chancellor, Sir George James Turner, in passing upon the demurrer, said:

"It was sought to support this bill on the right of a surety to be discharged from his liability. I have not the least intention to say anything which could prejudice such a right; but I conceive that the cases in which such a jurisdiction is exercised by this court are cases where the creditor has a right to sue the debtor, and refuses to exercise that right. It does not appear upon this bill that the creditor has any present right to sue. It is consistent with the statements on the bill, which must be taken most strongly against the pleader, that the bills in respect of which a liability is said to be created may not yet have arrived at maturity, and that the defendant, therefore, is not in a condition to take any step for the purpose of enforcing his rights in respect of such bills. It was then said that this was a case of principal and agent, and that, if the principal may file a bill against his agent, the agent may file a bill against his principal; but I cannot admit that the rights of principal and agent are correlative. The right of the principal rests upon trust and confidence reposed in the agent, but the agent reposes no such trust or confidence in the principal. It was lastly said that the accounts had been given up by the plaintiff to the defendant; but, if that case were sufficiently made out, it would give the plaintiff a right to file a bill of discovery, but it would not give him a right to relief."

And see, also, *Smith v. Leveaux*, 2 De Gex, J. & S. 1, and cases cited in note.

Neither is the complainant entitled to relief on the ground that he is a surety for Mrs. Burchard or co-surety with Sweet. If it be granted that Nash is a surety for Mrs. Burchard upon the notes held by the bank, he does not show that he has paid them, and until he has performed his part of the undertaking he has no ground for calling upon Mrs. Burchard to give him any additional security than such as was placed in his hands at the time he received the goods at the chattel mortgage sale. Neither can he ask for any different contract for security than that which he received by the terms of the

will.   Equity has no power to create new contracts between parties, or to supply omissions in contracts they have deliberately made, in the absence of fraud, accident, or mistake.   What was the security provided for in the will?   Simply that he was to be paid $5,000 out of the estate she might leave at her death, after paying the expenses of her burial.   This did not contemplate that she should not dispose of any property she might have at that time, or that she should not use it in her support, or as she pleased.   No lien was created or intended to be created upon any of her property during her life, but only upon such as she should leave at the time of her death.   She made no contract for any other or different security than that mentioned.

Neither a contract creditor nor a surety can, by proceedings in equity, compel his debtor or principal to turn his property over to a receiver to secure a debt or satisfy it before obtaining judgment and exhausting his remedy at law.

Neither has complainant any right to the security held by Sweet to indemnify him against his indorsement on the $500 note to the Savings Bank.   On the face of the note Nash is the maker; Mrs. Burchard and Mr. Sweet are indorsers.   It is competent for the first indorser to secure the second indorser, but the maker has no right to be subrogated to the place of a second indorser.   So, also, taking Nash's statement that Mrs. Burchard is the one who ought primarily to be liable in equity for the payment of the note, if she should secure Sweet as a second or as a co-indorser, Nash cannot be entitled to the benefit of the security without having first paid the note.   Burge, Sur. §§ 261, 269.

Upon any view I can take of the statements of the bill, I cannot see that the complainant has made such a case

as entitles him to the relief prayed; and the decree appealed from is affirmed, with costs.

MORSE, LONG, and GRANT, JJ., concurred. McGRATH, J., did not sit.